1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GABRIEL HERNANDEZ, RODOLFO )
NAVA, IVAN MADRIGAL, )
FRANCISCO CASTILLO, JOEL ROSA )
DE JESUS, JUAN CARLOS )
NAVARRETE, JUAN JOSE ACOSTA )
FLORES, ISMAEL AMPARAN-COBOS, )
EFREN RUANO, JUAN PALOMERA, )
OCTAVIO ANCHONDO, ARNOLDO )
RODRIGUEZ, and JESUS ANCHONDO, )
                                                                )
            Plaintiffs, )
                                                                )
    v. )
                                                                )
CREATIVE CONCEPTS, INC.; SPEIDEL )
ENTERPRISES, INC.; JOHN SPEIDEL; )
PAUL SCHELLY; NORTHERN )
PIPELINE CONSTRUCTION CO.; and )
NPL CONSTRUCTION CO., )
                                                                )
            Defendants. )
_____ )

ORDER

2:10-CV-02132-PMP-VCF

        Before the Court is Defendant NPL Construction Co.'s ("NPL") Motion for

Summary Judgment (Doc. #42), filed on August 15, 2011.  Plaintiffs filed an Opposition

(Doc. #66) and a Motion for Continuance of Submission of NPL's Summary Judgment

Motion (Doc. #65) on October 26, 2011.  Defendant NPL filed an Opposition to Plaintiff's

Motion for Continuance (Doc. #70) and a Reply (Doc. #71) on November 18, 2011.  The

Court held a hearing on these motions on February 22, 2012.  (Mins. of Proceedings (Doc.

#73).)  Following the hearing, the parties submitted supplemental briefs (Doc. #79, #81,

#84, #85) pursuant to the Court's Order (Doc. #74).

///

## I. BACKGROUND

Plaintiffs are former employees of Defendant NPL.  (Mot. Summ. J. (Doc. #42) ["MSJ"], Ex. 4 at 3-4, Ex. 8.)  NPL is a Nevada corporation formed out of a merger in 1996 between Northern Pipeline Construction Co., a Minnesota corporation, and Southwest Gas Company of Arizona, a Nevada corporation.  (MSJ, Ex. 1 at 2, Ex. 5.)  After the merger, the surviving corporation's legal name was Northern Pipeline Construction Co., but it did business under the name NPL Construction Co. until 2008 when it formally changed its legal name to NPL Construction Co.  (MSJ, Ex. 1 at 2.)  NPL was a signatory to collective bargaining agreements ("CBAs") with local units of the International Laborers Union of North America at all relevant times.  (MSJ, Ex. 1 at 2, Ex. 4 at 2, Exs. 6, 7.)  Plaintiffs were members of the union during their employment with NPL.  (MSJ, Ex. 4 at 3, Exs. 9, 10.)

The CBAs provide that the agreements were entered into between NPL and the union "in a mutual effort to determine the hours, wages, fringes and other conditions of employment and to adopt measures for the settlement of differences and monitoring a cooperative relationship so that the employer may have sufficient capable Laborers and the Laborers may have as much continuous employment as possible, without interruption by strikes, lockouts, or other Labor-management trouble."  (MSJ, Ex. 6 at 1.)  The CBAs further provide that NPL had "sole jurisdiction of the management and operation of its[] business, the direction of its[] workforce, . . . and to hire and discharge employees subject to the provision of this agreement."  (Id. at 3.)  The CBAs also contain a wage rate schedule and a procedure for settling grievances.  (Id. at 10-11.)

In April 2002, NPL received letters from the Social Security Administration advising that the names and social security numbers of some employees, including Plaintiffs, did not match the information in the Social Security Administration's database. (MSJ, Ex. 1 at 2.)  In response to these letters, NPL advised employees that a company called Creative Concepts could assist individuals who have problems associated with their

social security numbers and immigration.  (Opp'n to Mot. Summ. J. (Doc. #66) ["Opp'n"], Ex. 5.)  NPL supervisors told Plaintiffs that if Plaintiffs continued to work for NPL and allowed money to be withheld from their paychecks to pay Creative Concepts, NPL would sponsor Plaintiffs in a program designed by Creative Concepts through which Plaintiffs would receive permanent legal resident status in the United States.  (Opp'n, Ex. 1 at 2-3.)

Creative Concepts' plan was to have the employer, NPL, sponsor employees with immigration problems in a labor certificate program.  (Opp'n, Ex. 13 at NPL-1434.) Creative Concepts presented its plan as having three phases.  (Id. at NPL-1435.)  First, Creative Concepts would collect documents and information from the employees.  (Id.) Second, Creative Concepts would apply for a labor certificate from the Department of Labor for each employee.  (Id.)  Finally, Creative Concepts would prepare all documents related to applying for adjustment of status.  (Id.)  Creative Concepts estimated the entire process would take from sixteen to twenty-seven months.  (Id.)  While this process was pending, Creative Concepts would provide employees with an "attorney ticket," which included a letter of representation, a copy of the labor certificate, and proof that the labor certificate was in process.  (Id. at NPL-1437-38.)

In November 2002, Plaintiffs entered into contracts with Creative Concepts, and it was agreed amongst Plaintiffs, Creative Concepts, and NPL that $20 or more per week would be deducted from each Plaintiff's paycheck to pay Creative Concepts for the immigration-related services.  (Opp'n, Ex. 1 at 4; MSJ, Ex. 2.)  In September 2003, Plaintiffs' applications for the labor certificates were sent to the Department of Labor. (Opp'n, Ex. 1 at 5.)  At that time, Defendant Paul Schelly ("Schelly") represented to the Immigration and Naturalization Service that he was Plaintiffs' attorney and/or representative.  (Id.)

While still working for NPL, former NPL foreman Lorenzo Acosta ("Acosta") heard NPL supervisor Cavin Donnell ("Donnell") state that Plaintiffs never would obtain

legal status and that the promises regarding adjustment of their status were deceptive. (Id. at 5-6.) According to Acosta, NPL made these deceptive promises to induce Plaintiffs to continue working for NPL for $12 per hour, which was lower than market wages, at a time when NPL needed workers. (Id.) In 2004, Acosta was working for a different employer when Acosta offered Plaintiffs Ismael Amparan-Cobos ("Amparan-Cobos") employment at a higher rate of $20 per hour. (Id.) Amparan-Cobos declined the offer because he believed he had to continue working for NPL to acquire permanent resident status in the United States. (Id. at 6.) Acosta told Amparan-Cobos what he had heard while employed at NPL. (Id.) Amparan-Cobos confronted Donnell who denied the allegations and assured Amparan-Cobos that the process was legal and that Amparan-Cobos should continue to work for NPL. (Id.) Amparan-Cobos experienced a similar incident with Andy Pressimone ("Pressimone"), who also left NPL and later sought to hire Amparan-Cobos at a higher rate. (Id.) Pressimone likewise advised Amparan-Cobos that the immigration plan was a deceptive scheme to keep illegal immigrants working at NPL for low wages. (Id.) Amparan-Cobos confronted Donnell, who again assured Amparan-Cobos that the plan was legitimate. (Id.)

In 2005, the Department of Labor granted Plaintiffs' employment certifications. (Id. at 5.) Creative Concepts then represented it would obtain lawful resident status for each Plaintiff. (Id.) In October and November 2005, Plaintiffs, Creative Concepts, and NPL agreed that $25 or more would be deducted from Plaintiffs' paychecks to pay for Creative Concepts' continued immigration services. (Id.; MSJ, Ex. 2.)

In October 2007, the United States Citizenship and Immigration Service ("USCIS") advised Plaintiffs via Defendant Schelly that their applications for employment authorization were denied. (Opp'n, Ex. 1 at 6.) Plaintiffs contend this was the first time they discovered that the required forms for them to receive lawful permanent resident status and to apply for employment authorization had not been filed. (Id.) Thereafter, NPL fired

1    Plaintiffs due to their illegal status in the country.  (Id. at 7.)  According to Amparan-Cobos,

2    Donnell told Plaintiffs that the plan to provide them legal status was a sham aimed at

3    obtaining needed workers at low wages.  (Id.)

4           After being terminated, Amparan-Cobos went to his union representative George

5    Vaughn ("Vaughn").  (Id. at 8.)  Vaughn stated the union could not help Plaintiffs because

6    the immigration plan was not part of a CBA and the union was not a party to the agreement

7    between NPL, Creative Concepts, and Plaintiffs.  (Id.)  Plaintiffs did not submit a grievance

8    or otherwise pursue remedies under the CBA, they did not file an unfair labor practice

9    charge against NPL, and they did not file a claim against the union for failure to represent

10   them.  (MSJ, Ex. 4 at 5.)

11          Plaintiffs originally brought suit in Nevada state court on December 4, 2009,

12   alleging various state law claims against NPL, Creative Concepts, and the individuals

13   behind Creative Concepts.  (Notice of Removal (Doc. #1) at ¶ 1.)  Defendant NPL removed

14   the action to this Court on December 8, 2010, on the basis of federal question jurisdiction.

15   (Notice of Removal.)  Plaintiffs moved to remand, contending no federal question

16   jurisdiction exists in this action.  NPL opposed, arguing Plaintiffs' claims are preempted

17   under the Labor Management Relations Act ("LMRA") and the National Labor Relations

18   Act ("NLRA").  NPL also moved for judgment on the pleadings, arguing Plaintiffs' state

19   law claims were preempted and, if converted to federal claims, must be dismissed because

20   Plaintiffs failed to exhaust their remedies under the CBAs.  Alternatively, NPL argues

21   Plaintiffs' claims could be brought only before the National Labor Relations Board

22   ("NLRB").

23          This Court ruled that NPL had met its burden of establishing federal question

24   jurisdiction, concluding that under controlling case law from the United States Court of

25   Appeals for the Ninth Circuit, Plaintiffs' breach of contract claim was preempted under the

26   LMRA.  (Order (Doc. #25) at 14-15.)  However, the Court denied NPL's Motion for

Judgment on the Pleadings due to the difference in the standards between a motion to remand and a motion for judgment on the pleadings.  (Id. at 16-17.)  The Court granted NPL's motion to dismiss Plaintiffs' negligent misrepresentation and fraudulent inducement claims for failure to plead fraud with particularity, without prejudice to amend.  (Id. at 18.)

Plaintiffs thereafter filed their Second Amended Complaint (Doc. #29) ("SAC"), asserting claims against NPL for breach of contract (count two), breach of confidential relationship (count four), negligence (count six), fraudulent inducement (count nine), negligent misrepresentation (count ten), and federal civil Racketeer Influenced and Corrupt Organizations ("RICO") (count twelve).  NPL now moves for summary judgment, arguing Plaintiffs' claims are preempted by the LMRA or the NLRA.  NPL also argues that even if not preempted, Plaintiffs' state tort claims fail for other reasons.  Plaintiffs move for a continuance to conduct further discovery.  Plaintiffs also argue their claims are not preempted and their state tort claims are viable.

## II. DISCUSSION

### A.  Plaintiffs' Motion for Continuance of Submission of NPL's Summary Judgment Motion (Doc. #65)

Plaintiffs move the Court to defer ruling on summary judgment to allow Plaintiffs the opportunity to conduct more discovery.  Plaintiffs contend NPL has obstructed discovery by first refusing to engage in a Rule 26(f) conference and then refusing to answer discovery because there had been no Rule 26(f) conference.  Plaintiffs argue that even when NPL finally answered discovery, it did so through form objections, provided little substantive response, and responded close to the time Plaintiffs had to file their opposition to NPL's summary judgment motion.  Plaintiffs contend they have more discovery to complete and Plaintiffs would like to depose several witnesses, including several of the affiants upon whom NPL's motion relies.

///

NPL opposes, contending it has not delayed discovery and Plaintiffs are taking a contrary position to one Plaintiffs took earlier in the case when they stated NPL's motion would raise only issues of law.  NPL also contends Plaintiffs' attorney affidavit is insufficient to support a continuance.  NPL further argues Plaintiffs were not diligent in pursuing discovery.  Alternatively, NPL argues that if the Court grants further discovery, it should be limited to the scope of NPL's summary judgment motion.

Under Federal Rule of Civil Procedure 56(d) if, in response to a summary judgment motion, "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may defer consideration of the motion or deny it, allow the parties time to complete additional discovery, or grant other appropriate relief.  The party requesting additional time to conduct discovery to oppose summary judgment must present an affidavit stating the specific facts it hopes to elicit from further discovery, that the facts exist, and that the facts are essential to oppose summary judgment.  Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp., 525 F.3d 822, 827 (9th Cir. 2008).  If the nonmovant does not satisfy these requirements, the court may proceed to rule on summary judgment without granting additional discovery.  Id.

Plaintiffs' attorney affidavit is deficient.  Although it identifies the discovery to be undertaken, it does not identify what facts that discovery will uncover or how those facts would preclude summary judgment.  The Court therefore will deny Plaintiffs' Rule 56(d) motion.

**B.  Negligent Misrepresentation**

Count ten alleges NPL, in the course of its business, supplied false information to Plaintiffs' for Plaintiffs' guidance in business transactions, and Plaintiffs justifiably relied on those misrepresentations to their detriment.  However, a negligent misrepresentation claim based on a promise of future performance does not exist under Nevada law.  Cundiff

v. Dollar Loan Ctr. LLC, 726 F. Supp. 2d 1232, 1238 (D. Nev. 2010) ("[A]

misrepresentation as to future performance cannot be negligent because such a statement is

either fraudulent, i.e., the person never held that intention at the time he made the statement,

or it was not a misrepresentation at all, the person simply later failed to perform as

promised."). Here, Plaintiffs allege NPL promised to assist them in adjusting their status by

taking certain actions in the future, but NPL failed to live up to that promise. NPL either

intended to perform at the time it made the promise or it did not. If NPL did not intend to

perform at the time it made the promise, that is an intentional misrepresentation, not a

negligent misrepresentation. If NPL intended to perform at the time it entered the contract,

then it made no misrepresentation as to its intentions. Either way, there is no negligent

misrepresentation claim under these circumstances. The Court therefore will grant NPL's

Motion for Summary Judgment as to this claim.

### C.  NLRA Preemption

NPL argues Plaintiffs' claims are preempted by sections 7 and 8 of the NLRA.

NPL contends its promise to Plaintiffs arguably was an attempt to bargain with

union-represented employees for the purpose of affecting the terms and conditions of their

employment, and thus could be an unfair labor practice for directly dealing with employees

rather than the union. NPL also argues any representation made to Plaintiffs that NPL

would take care of all paperwork arguably was employer protected speech or an unfair labor

practice for promising a benefit for which the parties did not bargain. NPL further contends

its conduct could be deemed coercion.

Plaintiffs respond by arguing that NPL has not met its initial burden of

establishing its conduct arguably is subject to the NLRA. Plaintiffs also argue that because

NPL approached Plaintiffs outside of any union representation, and the conduct was outside

any CBA even if one existed, the NLRA does not arguably apply. Plaintiffs contend NLRA

preemption does not exist unless resolution of a state law claim depends on the meaning of

a CBA, and Plaintiffs' claims do not depend on the CBA.  Plaintiffs further argue that even if the NLRA preempts their claims, exceptions to preemption apply.

Pursuant to section 7 of the NLRA, "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. Section 8 of the NLRA sets forth certain unfair labor practices, including interfering with, restraining, or coercing employees in the exercise of employees' section 7 rights, and refusing to bargain collectively with the union.  Id. § 158(a).  However, under section 8(c), the employer is permitted to express "any views, argument, or opinion . . . if such expression contains no threat of reprisal or force or promise of benefit."  Id. § 158(c). Pursuant to § 159(a), the union is the exclusive representative of all the employees in the collective bargaining unit "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."

The NLRA has unique preemptive force.  "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ."  San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 245 (1959).  This is referred to as Garmon preemption, after the case that first recognized the principle.  Garmon preemption divests both state and federal courts of jurisdiction to hear a preempted claim, as only the NLRB may address the dispute.  Id.

The party claiming Garmon preemption must show "that his case is one that the [NLRB] could legally decide in his favor."  Operating Eng'rs Pension Trust v. Wilson, 915 F.2d 535, 539-40 (9th Cir. 1990) (quotation omitted).  A conclusory claim of Garmon preemption does not suffice.  Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 396 (1986).  Rather, the party claiming Garmon preemption bears the burden of showing the

activity arguably is subject to the NLRB's exclusive jurisdiction.  Id.  To meet this burden, the party asserting preemption "must advance an interpretation of the Act that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the Board.  The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation."  Id. at 395 (internal citation and quotation marks omitted).

Garmon preemption is subject to some exceptions.  First, a claim under section 301 of the LMRA still may be heard in federal court even if it involves conduct that arguably is an unfair labor practice that otherwise would be subject to Garmon preemption under the NLRA.  Local 952, Int'l Bhd. of Teamsters v. Am. Delivery Serv. Co., 50 F.3d 770, 773 (9th Cir. 1995).  In other words, a claim properly brought under section 301 of the LMRA is not subject to Garmon preemption under the NLRA because section 301 "carves out a broad exception to the NLRB's primary jurisdiction for claims arising out of collective bargaining agreements, whether or not such claims would also be an unfair labor practice. . . ."  Id. at 774 (quotation omitted).

Second, conduct that is arguably prohibited or protected by the NLRA will not be preempted under Garmon if the alleged conduct is "a merely peripheral concern" of the Act or implicates interests that are "deeply rooted in local feeling and responsibility."  Garmon, 359 U.S. at 243-44.  To determine whether an interest is deeply rooted in local feeling and responsibility, the Court first considers whether a significant state interest in protecting against the challenged conduct exists.  Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters, 436 U.S. 180, 196 (1978).  Actions which implicate interests deeply rooted in local feeling and responsibility include violence, threats of violence, libel, and intentional infliction of emotional distress.  Id. at 195 (collecting cases).  Courts also have found that a state has a "substantial interest in protecting its citizens from misrepresentations that have caused them grievous harm."  Belknap, Inc. v. Hale, 463 U.S.

491, 511 (1983); Milne Emps. Ass'n v. Sun Carriers, 960 F.2d 1401, 1417 (9th Cir. 1991).

If the state has an interest in protecting its citizens from the alleged conduct, the Court next inquires whether "the exercise of state jurisdiction over the tort claim entail[s] little risk of interference with the regulatory jurisdiction of the Labor Board." Sears, Roebuck & Co., 436 U.S. at 196.  If it poses little risk, the state law claim may proceed even if "the challenged conduct occurred in the course of a labor dispute and an unfair labor practice charge could have been filed."  Id.  The "critical inquiry" is "whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board."  Id. at 197.  Where the state claim and the hypothetical claim before the Board are "the same in a fundamental respect," the state claim is preempted.  Local 926, Int'l Union of Operating Eng'rs v. Jones, 460 U.S. 669, 682-683 (1983).   In other words, if a "crucial element" of the state claim is "identical to an element of an unfair labor practice that is arguably covered by the NLRA, then the state action is preempted."  Lumber Prod. Indus. Workers Local No. 1054 v. W. Coast Indus. Relations Ass'n, Inc., 775 F.2d 1042, 1048 (9th Cir. 1985).  For example, where the underlying conduct involved employees picketing the workplace, a state trespass claim was not preempted even though the picketing arguably also constituted an unfair labor practice because the state claim focused on the location of the picketing and the federal labor claim would have focused on the purpose of the picketing.  Sears, Roebuck & Co., 436 U.S. at 198.

In determining NLRA preemption, the Court evaluates "the conduct being regulated, not the formal description of governing legal standards."  Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 292 (1971).  Among the factors the Court may consider are whether the alleged conduct involved a subject of mandatory bargaining, and whether the alleged conduct arose during, or outside of, collective bargaining.  Milne, 960 F.2d at 1415.  Making this determination "involves a

sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the Board's exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the state as a protection to its citizens." Jones, 460 U.S. at 676.

### 1.  Breach of Contract (count two)

As discussed below, this claim is LMRA preempted.  It therefore is not subject to Garmon preemption under the NLRA.  Am. Delivery Serv. Co., 50 F.3d at 773-74.

### 2.  Tort Claims

Assuming NPL has met its initial burden of establishing Plaintiffs' tort claims arguably are subject to NLRA section 7 or section 8, the tort claims fall within the deeply rooted in local feeling and responsibility exception and are of peripheral concern to the Act. Plaintiffs' various tort claims are based on NPL's conduct of making false representations to Plaintiffs.  Nevada[1] has a strong interest in protecting against such conduct.

There is little risk of interference with the Board's regulatory jurisdiction because the Court would resolve controversies different than the controversies that would have been presented to the Board.  The questions before the NLRB would be whether NPL's offer to assist in adjusting Plaintiffs' immigration status was a term and condition of employment, whether NPL's promises were privileged under section 8(c), and whether the proposed inducement tended to undermine the union's status as the exclusive bargaining representative.  This Court, however, largely would be concerned with whether NPL made false representations to Plaintiffs.  It would be irrelevant to the Board's inquiry whether NPL's promises were false because NPL's alleged direct bargaining would violate the Act regardless of whether NPL intended to follow through on its promises.  The Board would

---

[1] Plaintiffs also assert a federal civil RICO claim.  The "state" in relation to this claim is the federal government, which likewise has a substantial interest in protecting against illegal racketeering activity.

be focused on the relationship between NPL and the union, whereas this Court would be focused on NPL's false promises to Plaintiffs, whether Plaintiffs justifiably relied on those misrepresentations, whether Plaintiffs and NPL were in a confidential relationship, whether NPL owed Plaintiffs any duties, whether NPL breached any such duties, and whether Plaintiffs were damaged as a result of NPL's conduct.  For these same reasons, Plaintiffs' state tort claims are of peripheral concern to the Act.  Plaintiffs allege a post-collective bargaining promise aimed at inducing employees to remain employed with the employer. There is no allegation or evidence that NPL made the false representations during the collective bargaining process or to secure a concession from the union.

This case is similar to other cases involving post-collective bargaining false representations where circuit courts have found no Garmon preemption.  In Milne, the Ninth Circuit held that an employer's post-collective bargaining false representation regarding its plans for closing down a plant, even if arguably subject to the Act, would not present the same controversy before the Board because--

> the Board would have examined issues such as whether Milne had given the unions meaningful notice of its decision to close, whether Milne had engaged in surface bargaining in its offer to bargain with the unions, or whether special circumstances influenced the timing of Milne's notice to the unions.  Resolution of the fraud and emotional distress claims, however, would focus upon different issues.  The state court would inquire whether Milne made misrepresentations to the employees, whether the employees relied on such statements, whether the employees were damaged, and whether the employees suffered severe or extreme emotional distress from defendants' conduct. Hence, despite the commonality of some underlying facts, allowing the employees to pursue their state law claims will not interfere with the Board's determination of matters within its scope of expertise.

960 F.2d at 1416-17 (internal citations omitted).

The Court finds particularly instructive the Fifth Circuit's decision in E.I. DuPont de Nemours & Co. v. Sawyer, 517 F.3d 785, 789-90 (5th Cir. 2008), which reached a conclusion similar to the Ninth Circuit's result in Milne.  In Dupont, the employees alleged their employer "fraudulently induced them to terminate their employment and accept

employment with a subsidiary that was later sold." <u>Dupont</u>, 517 F.3d at 789. The union and the employer had engaged in collective bargaining regarding the effects of the planned transfer of certain work to the subsidiary, and they had reached an agreement that generally provided that employees who transferred to the subsidiary would enjoy similar compensation and benefits plans as they had with the original employer. <u>Id.</u> at 790. However, the employer shortly thereafter sold the subsidiary to another company, which altered the terms of employment to the employees' detriment. <u>Id.</u> at 791. The employees brought state law claims for fraud and fraudulent inducement, alleging that while they still were employed with the original employer, the employer "repeatedly assured them that [the subsidiary] would not be sold to another entity, even though [the employer] knew at the time that the sale of [the subsidiary] was a possibility." <u>Id.</u>

The Fifth Circuit held these claims were not <u>Garmon</u> preempted because the controversy presented by the state law claims was different than the controversy that would be presented to the Board. As the Fifth Circuit explained:

> A section 8 claim arising out of [the employer's] duty to give adequate notice of the [subsidiary's] sale for effects bargaining purposes would be concerned with two key questions: when [the employer] first notified the union of its decision to sell [the subsidiary] and whether that notice allowed for meaningful effects bargaining at a meaningful time. The focus would be on [the employer's] communications to and bargaining with the union. Strong federal labor interests relating to the employer-union relationship and the integrity of the collective bargaining process would be at stake in such a claim.
> In contrast, the gravamen of the employees' complaint here is that [the employer] fraudulently induced them to terminate their employment with [the employer] and accept employment with [the subsidiary]. The key questions are whether [the employer] made affirmative misrepresentations to the employees concerning its intentions to sell [the subsidiary] and whether the employees relied on those misrepresentations to their detriment in transferring to [the subsidiary]. Unlike a section 8 claim, which would focus on the relationship between [the employer] and the union, the state-law claims focus on the relationship between [the employer] and individual employees. In particular, they focus on the direct communications made by [the employer] to employees during the period of time when they were considering whether to transfer to [the subsidiary]. Since this was an individual decision that each employee had to make on his

14

own, independently of union decisionmaking or the collective bargaining process, the strong federal labor interests implicated by a section 8 claim are not present.  Rather, it is the state's "substantial interest in protecting its citizens from misrepresentations that have caused them grievous harm" that is at stake.  Belknap, 463 U.S. at 511, 103 S. Ct. 3172.

Id. at 793-94.

The Fifth Circuit noted that although the employer and the union had collectively bargained regarding the transfer of employees to the subsidiary, the employees' state law claims arose out of the employer's post-collective bargaining misrepresentations.  Id. at 794-95.  At the time the employer made the representations, the decision whether to transfer rested with each individual employee, and it was "toward this individual choice, and not any aspect of union decisionmaking or the collective bargaining process, that the alleged misrepresentations by [the employer] were directed."  Id. at 794-95 (emphasis omitted).

The Third Circuit reached a similar conclusion in Voilas v. General Motors Corp., 170 F.3d 367 (3d Cir. 1999).  There, the employees brought a state law misrepresentation claim alleging that after collective bargaining was completed, the employer misrepresented that a plant would close to induce the employees to take early retirement.  Voilas, 170 F.3d at 371-72.  The Third Circuit held the claim was not preempted because "the alleged fraud was not committed in connection with any part of the collective bargaining process nor does it touch and concern a mandatory duty on the part of the employer."  Id. at 379; see also Wells v. Gen. Motors Corp., 881 F.2d 166, 171-72 (5th Cir. 1989) (holding state law claim not preempted where employees alleged the employer made misrepresentations to induce employees to take early retirement because the employer's conduct "was not an attempt . . . to interfere with the collective bargaining process or to diminish the union's representative role; instead, it was a post-bargaining effort to induce individual employees to accept [the early retirement package]").

///

15

As in the above cases, here the collective bargaining process was completed, and it was then left to individual employees to decide whether to remain in NPL's employ or seek employment with another company.  Because this was an individual decision for each employee independent of the collective bargaining process, the NLRA's strong federal labor interests are not implicated.  Rather, it is the state's substantial interest in protecting against fraud that is at issue in this case.  Plaintiffs' tort claims are not NLRA preempted.

### D.  LMRA Preemption

Section 301(a) of the LMRA, 29 U.S.C. § 185(a), provides federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization."  Section 301 completely preempts any state law causes of action based on alleged violations of contracts between employers and labor organizations.  Ramirez v. Fox Television Station, Inc., 998 F.2d 743, 747 (9th Cir. 1993).  Section 301's preemptive force is "so powerful as to displace entirely any state claim based on a collective bargaining agreement, . . . and any state claim whose outcome depends on analysis of the terms of the agreement."  Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 997 (9th Cir. 1987) (internal citations omitted).  Section 301's preemptive effect extends beyond suits alleging contract violations to preclude artful pleading of contract claims as torts.  Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210-11 (1985).  "If the state tort law purports to define the meaning of the contract relationship, that law is pre-empted" as "inextricably intertwined with consideration of the terms of the labor contract."  Id. at 213.  However, if the state "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract," the tort claim is not preempted.  Young, 830 F.2d at 999 (quotation omitted).

"[N]ot every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by section 301 or other provisions of the federal labor law."  Chmiel v. Beverly Wilshire Hotel Co., 873 F.2d 1283,

1285 (9th Cir. 1989) (quotations omitted).  Rather, a state law claim is LMRA preempted if it is (1) "based upon a collective-bargaining agreement," or (2) "dependent upon an interpretation of the agreement."  Ramirez, 998 F.2d at 748; Aguilera v. Pirelli Armstrong Tire Corp., 223 F.3d 1010, 1014 (9th Cir. 2000).

        To determine whether a claim is preempted, the Court analyzes "whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA."  Burnside v. Kiewit Pac. Corp., 491 F.3d 1053, 1059 (9th Cir. 2007).  "If the right exists solely as a result of the CBA, then the claim is preempted, and [the Court's] analysis ends there."  Id.  However, if the right "exists independently of the CBA," the Court then must consider "whether it is nevertheless substantially dependent on analysis of a collective-bargaining agreement."  Id. (quotation omitted).  If it is dependent on interpreting the CBA, then the claim is preempted, but if it is not, "then the claim can proceed under state law."  Id. at 159-60.  Whether a claim is preempted is determined on a case-by-case basis grounded in an evaluation of the plaintiff's particular claims.  Allis-Chalmers Corp., 471 U.S. at 220.

        To determine whether a particular right inheres in state law or, instead, is grounded in a CBA at the first step of the analysis, the Court considers whether the state law claim's "legal character" is independent of rights under the CBA, not whether the plaintiff could have pursued a grievance under the CBA arising from the same set of facts.  Burnside, 491 F.3d at 1060; Cramer v. Consol. Freightways, Inc., 255 F.3d 683, 690 (9th Cir. 2001) (en banc) ("[E]ven if the CBA refers to the state law substantive right at issue, the claim is not preempted so long as it may be litigated without reference to the CBA.").  For example, a state law discrimination claim "need not be preempted merely because certain aspects of the collective bargaining agreement govern work assignments and discharges."  Detabali v. St. Luke's Hosp., 482 F.3d 1199, 1203 (9th Cir. 2007) (quotation omitted).

At the second step of the analysis, the Court must determine whether the state law claim can be resolved by "looking to" the CBA as opposed to interpreting it. Burnside, 491 F.3d at 1060 (quotation and alteration omitted). This distinction is "not always clear or amenable to a bright-line test." Id. (quotation omitted). However, a state-law remedy is "independent" of a CBA if "resolution of the state-law claim does not require construing the collective-bargaining agreement." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 407 (1988). Referencing a CBA to "discern that none of its terms is reasonably in dispute" does not rise to the level of interpreting the CBA. Burnside, 491 F.3d at 1059-60 (quotation omitted). "[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Lingle, 486 U.S. at 409-10. Neither a hypothetical connection between the claim and the CBA's terms nor a mere potentiality that interpretation or direct reliance on the CBA terms will occur will support preemption. Humble v. Boeing Co., 305 F.3d 1004, 1010 (9th Cir. 2002); Cramer, 255 F.3d at 692 ("A creative linkage between the subject matter of the claim and the wording of a CBA provision is insufficient; rather, the proffered interpretation argument must reach a reasonable level of credibility.").

### 1.  Breach of Contract (count two)

Count two of the SAC alleges NPL breached its promise that if Plaintiffs continued to work for NPL, NPL would ensure that all of the legal work necessary to obtain permanent residency for Plaintiffs would be completed. Plaintiffs thus allege NPL breached individual oral contracts with each Plaintiff related to the promise to assist Plaintiffs in adjusting their immigration status.

The Court set forth the applicable law in its prior Order. In sum, an independent contract between an employer and employee is preempted by § 301 when the employee is

18

subsequently hired under a CBA and the allegedly broken promise relates to a job covered by the CBA.  (See Order (Doc. #25) at 13-15 (collecting cases).)  Here, NPL has presented evidence that it is a signatory to the CBA at issue and that Plaintiffs belonged to the union during their employment with NPL.  Plaintiffs present no evidence to the contrary.  No genuine issue of material fact remains that NPL was a signatory to the CBA, Plaintiffs were members of the union, and their work was governed by the CBA.  The CBA thus supercedes any individual employment agreement under controlling precedent, and Plaintiffs' breach of contract claim is preempted under the LMRA.

Once a state law claim is preempted by section 301, the Court either must treat it as a section 301 claim or dismiss it as preempted by federal law.  Allis-Chalmers Corp., 471 U.S. at 220.  If converted, a section 301 claim requires an employee seeking to vindicate his rights under a CBA first to attempt to exhaust any mandatory grievance procedures in the CBA.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 985-86 (9th Cir. 2007).  An employee need not meet this exhaustion requirement if he demonstrates that the union breached its duty of fair representation.  Id.  If the employee makes this showing, he may sue both his employer and the union regardless of whether the grievance process is final. Id.  Moreover, in such a situation, the employee can bring suit for breach of the CBA solely against his employer, but he must allege and prove both that his employer breached the CBA and that the union breached its duty of fair representation.  Id. at 986-87.  An employee must allege both the employer's breach of the CBA and the union's breach of its duty of fair representation in the complaint to bring a "hybrid" section 301/fair representation claim, and may not raise the claim for the first time in response to a motion for summary judgment.  Id. at 988.

No genuine issue of material fact remains that Plaintiffs did not exhaust their contractual remedies.  NPL presents evidence that Plaintiffs did not pursue any remedies under the CBA, and Plaintiffs present no contrary evidence.  Plaintiffs therefore have failed

to exhaust their remedies.  Although an exception exists where a plaintiff simultaneously alleges a claim for breach of the duty of fair representation, Plaintiffs do not allege in the SAC that the union breached its duty of fair representation.  In an affidavit in support of Plaintiffs' opposition to the summary judgment motion, Plaintiff Amparan-Cobos avers he went to his union representative, but his union representative declined to pursue the matter under the CBA.  However, a plaintiff must plead the hybrid claim in his complaint, and cannot wait until the opposition to a summary judgment motion to pursue such a claim.

Plaintiffs' breach of contract claim is LMRA preempted.  Further, the Court will grant NPL's Motion for Summary Judgment on the preempted LMRA claim in count two for failure to exhaust remedies under the CBA.

### 2.  Breach of Confidential Relationship (count four)

Count four of Plaintiffs' SAC alleges Plaintiffs imparted special confidence in NPL to act as their agent to process their immigration papers, NPL knew or should have known of this confidence, and NPL breached its duty to act in good faith with due regard to Plaintiffs' interests.  NPL argues this claim is preempted because any confidential relationship between NPL and Plaintiffs is the result of the employment relationship and as such is controlled by the CBA.  NPL contends that determining whether NPL breached any duty owed out of a confidential relationship would require interpreting the CBA because the CBA defines the parameters and obligations of any confidential relationship between NPL and Plaintiffs.  Plaintiffs respond that this claim is not founded on any rights created by the CBA nor will it require interpretation of the CBA.

Nevada recognizes a cause of action for a breach of duty arising out of a confidential relationship.  Perry v. Jordan, 900 P.2d 335, 337-38 (Nev. 1995).  A confidential relationship "exists when one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."  Id. at 337 (quotation omitted).  A

confidential relationship "may arise by reason of kinship or professional, business, or social relationships between the parties." Id. "When a confidential relationship exists, the person in whom the special trust is placed owes a duty to the other party similar to the duty of a fiduciary, requiring the person to act in good faith and with due regard to the interests of the other party." Id. at 338. Whether a confidential relationship exists generally is a question of fact, but at summary judgment the Court must determine whether "a reasonable jury could conclude that a reasonable person would impart special confidence in the other party and whether that other party would reasonably know of this confidence." Yerington Ford, Inc. v. Gen. Motors Acceptance Corp., 359 F. Supp. 2d 1075, 1088 (D. Nev. 2004) (emphasis omitted), overruled on other grounds by Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 881 (9th Cir. 2007).

Plaintiffs' breach of confidential relationship claim is not LMRA preempted. The source of the right at issue in this claim is a duty imposed by Nevada state law, not the CBA. Plaintiffs do not seek to enforce any term of the CBA because the CBA does not cover adjustment of immigration status. The Court need not interpret the CBA to resolve this claim for the same reason. Nothing in the CBA would need to be interpreted to evaluate whether a confidential relationship arose out of NPL's post-collective bargaining promise to help individual employees adjust immigration status. If the CBA did not exist, Plaintiffs could assert the exact same claim. Nothing about the claim derives from the CBA and no reference to the CBA will be required to determine if NPL had a duty or breached that duty. Plaintiffs' breach of confidential relationship claim is not LMRA preempted.

### 3. Negligence (count six)

Count six alleges NPL breached a duty by failing to properly supervise its attorneys, consultants, and supervisors who made false statements to Plaintiffs. NPL argues this claim is preempted because the only duty imposed on NPL is under the CBA, as an employer owes no common law duty to assist its employees in adjusting status. Further,

NPL's duty to supervise its managers is covered under the CBA's terms regarding NPL's right to direct its workforce and manage its business.  Plaintiffs respond that the CBA has nothing to do with whether NPL breached its common law duty to Plaintiffs and the alleged conduct was outside of any CBA.

The source of this claim derives from Nevada law, not the CBA.  Although the rights and duties at issue do not derive from the CBA, determining whether NPL breached a duty will require interpretation of the CBA with respect to NPL's alleged failure to supervise its own managers.  The CBAs provide that NPL had sole control over the management and operation of its business, the direction of its workforce, and hiring and firing employees.  Accordingly, the contract may impact the standard of care NPL had to exercise in supervising its managers vis-a-vis its union-represented employees.  The Court therefore would have to interpret the CBA to resolve the aspect of this claim related to NPL's alleged negligent failure to supervise its managers.  This aspect of Plaintiffs' negligence claim therefore is LMRA preempted.

However, nothing in the CBA would need to be interpreted to determine whether NPL negligently failed to supervise its outside consultant in the context of the post-bargaining promises made here.  The CBA has no application to NPL's alleged negligent supervision of its outside consultant, Creative Concepts.  The Court would not need to interpret the CBA to determine if NPL breached a common law duty to supervise its outside agent with respect to post-collective-bargaining promises made to individual employees.  This aspect of Plaintiffs' negligence claim is not LMRA preempted.

### 4.  Fraudulent Inducement (count nine)

Count nine alleges that NPL supervisors and managers made various false statements regarding the immigration program with the intent to induce Plaintiffs to continue to work for NPL, and Plaintiffs justifiably relied on those promises to their detriment.  NPL contends this claim is LMRA preempted because Plaintiffs allege they

were paid less than other employees under the CBA.  NPL also argues the fraudulent

inducement claim will require Plaintiffs to show the terms of the CBA differed from their

individual employment contracts.

Plaintiffs respond that they need not reference the CBA because their claim is

predicated on Plaintiffs accepting lower wages than other employers not subject to the CBA

would have paid Plaintiffs.  Specifically, Plaintiffs have presented evidence that other

employers offered Amparan-Cobos a higher paying job, but he declined to take those jobs

because pursuing legal status for himself and his family was more important than a higher

wage.  Plaintiffs also have presented objective evidence of prevailing wages for their jobs

in the market during the relevant time period.  Plaintiffs contend that no interpretation of

the CBA would be required.  At most, the Court would have to refer to the CBA to see what

the wage rates are, but it would not have to interpret the CBA.

This claim is not LMRA preempted.  At the first step of the preemption analysis,

Plaintiffs' fraudulent inducement claim does not rely on the CBA.  Under Nevada law, to

prove fraudulent inducement, Plaintiffs must show (1) NPL made a false representation; (2)

which NPL knew or believed was false or NPL had an insufficient basis for making the

representation; (3) NPL intended to induce Plaintiffs to act or refrain from acting upon the

misrepresentation; and (4) Plaintiffs were damaged as a result of relying on the

misrepresentation.  Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1386 (Nev. 1998).  The

right at issue is created by state law, not the CBA, which does not speak to the subject of

adjustment of status.  Plaintiffs do not allege a violation of the CBA, they allege a false

promise outside the CBA upon which they relied to their detriment to agree to continue to

work for NPL.

At the second step of the LMRA preemption analysis, the claim will not require

interpretation of the CBA.  The question is whether Plaintiffs were fraudulently induced

into remaining subject to the CBA's terms, and that will not involve interpreting the CBA.

Fraudulent inducement claims typically are not LMRA preempted.  See Am. Delivery Serv. Co., 50 F.3d at 774 ("Because a claim of fraud in the inducement does not require interpretation of a CBA, it is not preempted by Section 301(a)."); Wilson, 915 F.2d at 538 (holding that a claim an employer was fraudulently induced into signing a CBA was not preempted because the claim's elements did not require interpreting the CBA).  Moreover, where the Ninth Circuit has found a related fraud claim preempted, the nature of the plaintiff's claim would have required the plaintiff to show that the terms of the individual contracts differed from the CBA.  See Bale v. Gen. Tel. Co. of Cal., 795 F.2d 775, 780 (9th Cir. 1986); Stallcop v. Kaiser Found. Hosps., 820 F.2d 1044, 1049 (9th Cir. 1987); Young, 830 F.2d at 1001; see also Beals v. Kiewit Pac. Co., 114 F.3d 892, 895 (9th Cir. 1997) (limiting Bale, Stallcop, and Young to situations where the misrepresentation at issue involved disputed terms of a CBA).

Here, however, Plaintiffs do not allege their individual contracts are different than the CBA. Rather, Plaintiffs claim they were fraudulently induced into accepting and continuing to agree to be bound by the CBA's terms and that they were paid less than prevailing market wages.  Plaintiffs allege NPL wanted to keep Plaintiffs as employees because they were "cheap" labor, NPL paid them "below the wages that were being paid legal workers to do the same job," and NPL "planned to mislead the illegal workers into continuing to work for less pay." (SAC at 25, 26, 27, 65, 100, 102.)  However, Plaintiffs do not allege they were paid less than other NPL employees under the CBA.  Rather, the factual allegations are that other employers offered more money for the same work.  (Id. at 22-23.)  NPL has not presented evidence establishing that no genuine issue of material fact remains that Plaintiffs were paid inconsistently with what the CBA required or that this is the gravamen of Plaintiffs' SAC.  Plaintiffs' fraudulent inducement claim therefore is not LMRA preempted.

///

### 5.  Civil RICO (count twelve)

NPL does not argue the federal civil RICO claim is preempted.  This claim is not LMRA preempted because the LMRA preempts only state law claims.  <u>Adkins v. Mireles</u>, 526 F.3d 531, 539 (9th Cir. 2008).

**E.  Merits**

In addition to the preemption arguments, NPL moves for summary judgment on the merits of Plaintiffs' fraudulent inducement and confidential relationship claims.

### 1.  Fraudulent Inducement

NPL argues that a fraudulent inducement claim cannot be based on an alleged misrepresentation about the law.  Plaintiffs respond that such a claim can exist where the defendant represents that it has specialized or greater knowledge, NPL stood in a fiduciary-like relationship to Plaintiffs, NPL endeavored to secure Plaintiffs' confidence, and NPL had special reasons to expect that Plaintiffs would rely on NPL's opinion because NPL presented the plan through attorneys to give it an air of legitimacy.

"'[A]s a general rule, . . . fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law.'"  <u>Miller v. Yokohama Tire Corp.</u>, 358 F.3d 616, 621 (9th Cir. 2004) (<u>quoting</u> Am. Jur. 2d <u>Fraud and Deceit</u> § 97 (2001)).  "Statements of domestic law are normally regarded as expressions of opinion which are generally not actionable in fraud even if they are false."  <u>Id.</u>  However, this rule is subject to four exceptions:  (1) where the defendant purports to have special knowledge; (2) where the defendant stands in a fiduciary or similar relationship to the plaintiff; (3) where the defendant successfully has sought to secure the plaintiff's confidence; or (4) where the defendant has some other special reason to expect the plaintiff will rely on his opinion.  <u>Id.</u>

Plaintiffs do not dispute that their fraudulent inducement claim rests upon a misrepresentation of law, i.e., that Plaintiffs would be eligible for adjustment of status through the labor certification program.  However, a genuine issue of material fact remains

as to whether any exceptions apply.  For example, a reasonable jury could find NPL

purported to have special knowledge in that it hired a company for the specific purpose of

assisting employees with immigration and social security problems.  Among the personnel

at the meetings between Creative Concepts, NPL, and Plaintiffs, were NPL supervisors and

an attorney for Creative Concepts.  By contracting with an attorney to provide these

services, a reasonable jury could conclude NPL was presenting this plan with special

knowledge of its legality.

Moreover, a reasonable jury could find NPL successfully sought to secure

Plaintiffs' confidence.  Plaintiffs have presented evidence that throughout the process, NPL

supervisors and managers assured Plaintiffs the process was proceeding as it should.  When

specifically confronted with accusations that the plan was a fraud, NPL supervisor Donnell

assured Amparan-Cobos that the plan was legal.  The Court therefore will deny NPL's

Motion for Summary Judgment on Plaintiffs' fraudulent inducement claim.

2.  Confidential Relationship

NPL contends that a confidential relationship cannot arise out of the

employer-employee relationship.  Plaintiffs respond that the relationship here goes beyond

the typical employer-employee relationship because NPL knew Plaintiffs were

undocumented and unsophisticated, and NPL knew Plaintiffs desperately wanted legal

status for themselves and their families.  NPL assured Plaintiffs the plan was legal, both

through the use of an attorney to give the plan an aura of authenticity, and by continuously

assuring Plaintiffs throughout the process that the plan was legal and was proceeding

toward successful completion.  Plaintiffs contend that more than the typical employment

relationship therefore existed.

A confidential relationship generally does not arise from the employer- employee

relationship.  Miller, 358 F.3d at 621 (citing California law).  Rather, "additional ties must

be brought out in order to create the presumption of a confidential relationship between the

two."  Id. (quotation omitted).  Miller does not provide any guidance on what "additional ties" might suffice.  However, under Nevada law, a confidential relationship exists when one reposes a special confidence in another and the relationship may arise through family, professional, business, or social relationships.  Perry, 900 P.2d at 337-38.

Plaintiffs have presented evidence Plaintiffs reposed special confidence in NPL and NPL knew or should have known of that confidence because NPL presented a plan to Plaintiffs to obtain legal residency for themselves and their families, NPL contracted with an outside consultant, legitimized the plan through an attorney, and repeatedly reassured Plaintiffs that the plan was legitimate and proceeding.  A reasonable jury could find these facts go beyond the typical employer-employee relationship sufficient to support a confidential relationship claim.  The Court therefore will deny NPL's Motion for Summary Judgment on Plaintiffs' breach of confidential relationship claim.

**III.  CONCLUSION**

IT IS THEREFORE ORDERED that Defendant NPL Construction Co.'s ("NPL") Motion for Summary Judgment (Doc. #42) is hereby GRANTED in part and DENIED in part.  The motion is granted as to Plaintiffs' claims for breach of contract (count two), negligence to the extent it is based on negligent supervision of its managers or supervisors (count six), and negligent misrepresentation (count ten).  The motion is denied in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Continuance of Submission of NPL's Summary Judgment Motion (Doc. #65) is hereby DENIED.


DATED: May 28, 2012

_____
PHILIP M. PRO
United States District Judge